**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 9, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

DANIEL T. PAULY, as personal
representative of the estate of Samuel
Pauly, deceased; DANIEL B. PAULY,

     Plaintiffs-Appellees,

v.

RAY WHITE; MICHAEL MARISCAL;
KEVIN TRUESDALE,

     Defendants-Appellants,

and

STATE OF NEW MEXICO,
DEPARTMENT OF PUBLIC SAFETY,

     Defendant.

No. 14-2035

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:12-CV-01311-KG-WPL)**

---

Matthew D. Bullock (Mark D. Jarmie on the briefs) of Jarmie & Associates,
Albuquerque, New Mexico, for Defendants-Appellants.

Lee R. Hunt of Lee Hunt Law, LLC, Santa Fe, New Mexico (Daniel J. O'Friel and
Pierre Levy of O'Friel and Levy, P.C., with him on the brief), for Plaintiffs-
Appellees.

---

Before **PHILLIPS**, **SEYMOUR**, and **MORITZ**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

On a dark and rainy night in October 2011, Samuel Pauly was shot to death through the window of his rural New Mexico home by one of three state police officers investigating an earlier road rage incident on Interstate 25 involving his brother. On behalf of Samuel Pauly's estate, his father filed a civil rights action against the three officers, the State of New Mexico Department of Public Safety, and two state officials, claiming defendants violated his son's Fourth Amendment right against the use of excessive force.[1] The officers moved for summary judgment, asserting qualified immunity. The district court denied their motions, and they appeal. We affirm.

# I

## Background

In reviewing an interlocutory appeal from the denial of qualified immunity, "we 'take, as given, the facts that the district court assumed when it denied summary judgment.'" *Morris v. Noe*, 672 F.3d 1185, 1189 (10th Cir. 2012)

---

[1] The father also asserted state law claims for negligent training (Count Two), wrongful death under the New Mexico Tort Claims Act (Count Three), and violation of New Mexico Constitution, art. II, § 10 (Count Four). Samuel Pauly's brother, Daniel Pauly, asserted a claim for loss of consortium (Count Five). The parties stipulated to dismissal of Count Two. Only the excessive force claim is at issue in this appeal.

(quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)).  To be sure, "[w]e may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." *Id.* (internal quotation marks omitted).  When we recite the facts of the case, "we view the evidence in the light most favorable to the non-moving party." *Weigel v. Broad*, 544 F.3d 1143, 1147 (10th Cir. 2008) (internal quotation marks omitted).  Accordingly, the following facts are taken directly from the material facts section in the district court orders denying qualified immunity,[2] where the court noted that its "recitation of material facts and reasonable references reflect the Plaintiffs' version of the facts as gleaned from the evidence of record and excludes facts, contested or otherwise, which are not properly before this Court in the motions for summary judgment." Aplt. App. at 693.

*A. Facts*

The incidents underlying this action started the evening of October 4, 2011, when Daniel Pauly became involved in a road rage incident with two females on the interstate highway going north from Santa Fe, New Mexico.  One of the

---

[2] The district court's recitation of the facts is identical in the order denying qualified immunity to Officers Mariscal and Truesdale and the separate order denying qualified immunity to Officer White.  We therefore cite primarily to the latter order when setting out the facts.

women called 911 to report a "drunk driver," claiming the driver was "swerving all crazy" and turning his lights off and on. *Id.* at 694. The women then started to follow Daniel on Interstate 25, apparently tailgating him.

Daniel pulled his truck over at the Glorieta exit, as did the female driver of the car. Daniel felt threatened by the women and asked them why they were following him with their bright lights on. During this confrontation one of the women claimed Daniel was "throwing up gang signs." *Id.* He then left the off-ramp and drove a short distance to the house where he lived with his brother, Samuel. The house is located in a rural wooded area on a hill behind another house.

At some point between 9:00 and 10:00 p.m., a state police dispatcher notified Officer Truesdale about the 911 call. Officer Truesdale proceeded to the Glorieta off-ramp to speak to the women about the incident. Daniel had already left when Officer Truesdale arrived on scene. Officers Mariscal and White were also on their way to the off-ramp to assist Officer Truesdale. The women told Officer Truesdale that Daniel was driving recklessly. They described his vehicle as a gray Toyota pickup truck and provided dispatch with his license plate number. Dispatch notified Officer Truesdale that the Toyota pickup truck was registered to an address on Firehouse Road near the Glorieta off-ramp.

The women then went on their way, and at that point "any threat to [them] was over." *Id.* at 676. Officers White and Mariscal arrived to join Officer

-4-

Truesdale. The officers all agreed that there was not enough evidence or probable cause to arrest Daniel, and that no exigent circumstances existed at the time. Nevertheless, the officers decided to try and speak with Daniel to get his side of the story, "to make sure nothing else happened," and to find out if he was intoxicated. *Id.* at 677. Officers Truesdale and Mariscal decided they should take separate patrol units to the Firehouse Road address in Glorieta to see if they could locate Daniel's pickup truck. Officer White stayed at the off-ramp in case Daniel returned. Although it was dark and raining by that time, none of the officers were wearing raincoats.

Officers Mariscal and Truesdale proceeded to the Firehouse Road address and parked along the road in front of the main house. Both vehicles had their headlights on and one vehicle had its takedown lights on, but neither vehicle had activated its flashing lights. The officers did not see Daniel's truck at the main house but behind it they noticed a second house with its lights and porch lights on. They decided to approach the second house in an attempt to locate Daniel's pickup truck. As they walked towards that house, the officers did not activate their security lights.

To maintain officer safety, Officers Mariscal and Truesdale approached the second house in a manner such that neither brother knew the officers were at the property. The officers did not use their flashlights at first, and then only used them intermittently. Officer Truesdale turned on his flashlight as he got closer to

-5-

the front door of the brothers' house. Through the front windows, the officers could see two males moving inside the house. When they located Daniel's Toyota pickup truck, they contacted Officer White to so advise him. Officer White then left to join them.

At roughly 11:00 p.m., the brothers could see "through the front window two blue LED flashlights, five or seven feet apart, coming towards the house." *Id.* at 678. Daniel could not tell who was holding the flashlight approaching the house because of the dark and the rain but he feared it could be intruders related to the prior road rage altercation. "[I]t did not enter Daniel Pauly's mind that the figures could have been police officers." *Id.* The brothers hollered several times, "Who are you?" and, "What do you want?" *Id.* In response, the officers laughed and said: "Hey, (expletive), we got you surrounded. Come out or we're coming in." *Id.* Officer Truesdale also shouted once, "Open the door, State Police, open the door," while Officer Mariscal stated, "Open the door, open the door." *Id.* at 678-79. Daniel did not hear anyone say "State Police" until after the entire altercation was over. *Id.*

Fearing for their lives and the safety of their dogs, the brothers decided to call the police to report the unknown intruders. Before Daniel could call 911, however, he heard someone yell: "We're coming in. We're coming in." *Id.* at 679. Believing that an invasion of their home was imminent, Samuel retrieved a loaded handgun for himself as well as a shotgun and ammunition for Daniel.

Daniel told his brother he would fire some warning shots while Samuel went back to the front of the house. One of the brothers then hollered, "We have guns." *Id.* at 679. The officers saw an individual run to the back of the house, so Officer Truesdale proceeded to position himself towards the rear of the house. He then shouted, "Open the door, come outside." *Id.*

While Officers Truesdale and Mariscal were attempting to get the brothers to come outside, Officer White arrived at the Firehouse Road address and approached the house in the back, using his flashlight periodically. He saw individuals moving inside the house and arrived just as one of the brothers said: "We have guns." *Id.* at 680. Officer White testified in his deposition that when he heard this statement he immediately drew his weapon and took cover behind a stone wall fifty feet away from the front of the brothers' house. *Id.* at 221; *see also id.* at 680. Officer Mariscal also took cover behind a pickup truck, while Officer Truesdale remained in his position at the back of the house.

Because of the prior threatening statements made by Officer Truesdale and Mariscal, Daniel did not feel comfortable stepping out of the front door to fire warning shots. But a few seconds after the officers heard, "We have guns," *id.* at 680, Daniel stepped partially out of the back door and fired two warning shots while screaming loudly to scare anyone off. Officer White thought Officer

Truesdale had been shot after hearing the two shotgun blasts.[3]  A few seconds

after Daniel fired the warning shots, Officer Mariscal and White noticed Samuel

open the front window and point a handgun in Officer White's direction.  Officer

Mariscal testified he immediately shot at Samuel but missed.  "Four to five

seconds after Samuel Pauly pointed his handgun at Officer White, Officer White

shot Samuel" from his covered position fifty feet away.  *Id.* at 681.  The entire

incident took less than five minutes.

*B. Procedural History*

Plaintiff Daniel T. Pauly, as the personal representative of the Estate of

Samuel Pauly, filed suit against Officers Mariscal, Truesdale, and White, the

State of New Mexico Department of Public Safety (NMDPS), and two state

officials.  He alleged an excessive force claim under 42 U.S.C. § 1983 and several

state law claims.  Plaintiffs seek compensatory damages, punitive damages, pre-

and post-judgment interest, and costs and attorneys' fees on their federal and state

law claims.  Relevant here is plaintiff estate's § 1983 claim against all three

officers for violating Samuel Pauly's Fourth Amendment right to be free from

excessive force.

All three officers moved for summary judgment and raised the defense of

_____

[3] Officer White testified in his deposition that after he heard the shots at the
back of the house, "I believed Officer Truesdale had been shot at that point, being
that I believed he was at the rear of the residence."  Aplt. App. at 223, White dep.
at 137.  He also admitted, however, that "I did not hear anything that would
suggest a person had been hit."  *Id.*, White dep. at 139.

qualified immunity with respect to the § 1983 excessive force claim. Defendants analyzed the excessive force claim by reviewing the actions of each deputy individually, not their actions as a whole. They all argued they were entitled to qualified immunity because plaintiff estate could not show Samuel's claimed Fourth Amendment rights were clearly established or violated, and in any event their actions were objectively reasonable.

Specifically, Officer White asserted that when Samuel pointed the gun in his direction, any police officer would have reasonably assumed his life was in danger whether or not Samuel intended to fire, and deadly force was therefore justified under the totality of the circumstances. He contended it was not feasible for him to warn Samuel to drop his weapon.

Officer Truesdale argued it was undisputed that he did not fire his weapon at Samuel Pauly and therefore he could only be liable if his pre-seizure conduct "created the need for deadly force in this incident through his own reckless, deliberate conduct" that "was immediately connected to Officer White's use of force in self-defense." Aplt. App. at 359. He then argued that his actions leading up to the use of force were reasonable and that even if he made mistakes in how he approached the house, none of his conduct preceding the use of force by Officer White was reckless or deliberate. He further claimed his actions were not the but for or proximate cause of Samuel's death because the brothers' own actions were "independent and unexpected intervening events" amounting to a

-9-

superseding cause of death that defeated any liability on his part. *Id.* at 363-64.

Officer Mariscal argued that when he saw Samuel point the gun at Officer White, "he was clearly justified in using deadly force in defense of Officer White's life." *Id.* at 392-93. Like Officer Truesdale, Officer Mariscal contended that his actions leading up to the use of force were not reckless or deliberate, and that his pre-seizure conduct was not the but for or proximate cause of Samuel's death.

The district court issued two orders, denying summary judgment on all claims. In its first order, the court denied Officer White qualified immunity, concluding that "the record contains genuine disputes of material fact regarding whether the officers' conduct prior to the shooting of Samuel Pauly was at the very least reckless and unreasonably precipitated Officer White's need to shoot Samuel Pauly." *Id.* at 684. Based on the record, the court also determined that

> it is disputed whether (1) the Officers adequately identified themselves, either verbally or by using a flashlight; (2) the brothers could, nonetheless, see the Officers considering the ambient light and other light sources; and (3) it was feasible for Officer White to warn Samuel Pauly before shooting him.
>
> Furthermore, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find the following: there were no exigent circumstances requiring the Officers to go to Daniel Pauly's house at 11:00 p.m.; Officers Truesdale and Mariscal purposefully approached the house in a surreptitious manner; despite the porch light and light from the house, the rain and darkness made it difficult for the brothers to see who was outside their house; the fact that the brothers' house is located in a rural wooded area would have heightened the brothers' concern about intruders; the Officers

-10-

provided inadequate police identification by yelling out "State Police" once; the Officers' use of a hostile tone in stating, "we got you surrounded. Come out or we're coming in" was threatening; statements by Officers Truesdale and Mariscal of "open the door" and other statements of "we're coming in" were, likewise, threatening; it would have been reasonable for the Officers to conclude that Daniel Pauly could believe that persons coming up to his house at 11:00 p.m. were connected to the road rage incident which had occurred a couple of hours previously; that under these circumstances, the occupants of the house would feel a need to defend themselves and their property with the possible use of firearms; and the incident occurred in less than five minutes.

*Id.* at 684-85. The court made virtually the same determinations in its separate order denying qualified immunity to Officers Truesdale and Mariscal. *Id.* at 703-04.

All officers appeal the denial of their qualified immunity.


## II

## Jurisdiction

We have jurisdiction under 28 U.S.C. § 1291 to review "all final decisions of the district courts of the United States." Generally, "[o]rders denying summary judgment are . . . not appealable final orders for purposes of 28 U.S.C. § 1291." *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013); *see also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978). "The denial of qualified immunity to a public official, however, is immediately appealable under the collateral order doctrine to the extent it involves abstract issues of law."

-11-

*Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013); *accord Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[W]e hold that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."). Appealable matters thus involve "disputes about the substance and clarity of pre-existing law," not about "what occurred, or why an action was taken or omitted." *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011).

Accordingly, under our limited jurisdiction we may review "'(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation.'" *Roosevelt-Hennix*, 717 F.3d at 753 (*quoting Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266-67 (10th Cir. 2013)). "Ordinarily speaking, it is only these latter two questions–and not questions about what facts a jury might reasonably find–that we may consider in appeals from the denial of qualified immunity at summary judgment." *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010).

In contrast, we have no interlocutory jurisdiction to review "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 320 (1995). "[T]he Supreme Court [has] indicated that, at the summary judgment stage at least, it is generally the district court's exclusive job

to determine which *facts* a jury could reasonably find from the evidence presented

to it by the litigants." *Lewis*, 604 F.3d at 1225 (citing *Jones*, 515 U.S. at 313).

Thus, "if a district court concludes that a reasonable jury could find certain

specified facts in favor of the plaintiff, the Supreme Court has indicated that we

usually must take them as true–and do so even if our own *de novo* review of the

record might suggest otherwise as a matter of law." *Id.*; *see also Cortez v.

McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) ("Our interlocutory jurisdiction

is limited to legal questions drawn from facts that are deemed undisputed for

appellate purposes."). To the extent the officers raise only issues of law in their

appeals, we have jurisdiction.


# III

## Applicable Law

*A. Section 1983 and Qualified Immunity*

Title "42 U.S.C. § 1983 allows an injured person to seek damages against

an individual who has violated his or her federal rights while acting under color

of state law." *Cillo v. City of Greenwood Village*, 739 F.3d 451, 459 (10th Cir.

2013). "Individual defendants named in a § 1983 action may raise a defense of

qualified immunity," *id.*, which "protects 'government officials performing

discretionary functions' and shields them from 'liability for civil damages insofar

as their conduct does not violate clearly established statutory or constitutional

-13-

rights of which a reasonable person would have known.'" *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1199 (10th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "If the plaintiff[s] satisfy[] this two-part test, 'the defendant bears the usual burden of a party moving for summary judgment to show that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006) (quoting *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004)).

*B. Excessive Force*

"We review Fourth Amendment claims of excessive force under a standard of objective reasonableness, judged from the perspective of a reasonable officer on the scene." *Tenorio v. Pitzer*, 802 F.3d 1160, 1162 (10th Cir. 2015) (citing *Graham v. Conner*, 490 U.S. 386, 396-97 (1989)). And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396-97). In *Graham*, 490 U.S. at

-14-

396, the Supreme Court held "*all* claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."

In an excessive force case such as this, we ask "'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009) (quoting *Graham*, 490 U.S. at 397). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted); *see also Scott v. Harris*, 550 U.S. 372, 383 (2007) ("[W]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." (quoting *United States v. Place*, 462 U.S. 696, 703 (1983))). Indeed, this balancing test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490

-15-

U.S. at 396.

"In determining whether an officer's use of force was excessive, many [of our] cases have focused solely on the three factors specifically described in *Graham*." *Id.* (citing *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007)). "However, these three factors were not intended to be exclusive, and the circumstances of a particular case may require the consideration of additional factors." *Id.* When confronted with whether the use of deadly force was reasonable, we have held that "an officer's use of that force is reasonable only 'if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others.'"[4] *Thomson*, 584 F.3d at 1313 (quoting *Estate of Larsen*, 511 F.3d at 1260); *accord Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2007) ("In other words, '[a]n officer's use of deadly force in self-defense is not constitutionally unreasonable.'" (quoting *Romero v. Bd. of County Comm'rs*, 60 F.3d 702, 703-04 (10th Cir. 1995))). Moreover,

> In assessing the degree of threat the suspect poses to the officers, we consider factors that include, but are not limited to: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance

---

[4] "Deadly force is 'force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily harm. Purposefully firing a firearm in the direction of another person . . . constitutes deadly force.'" *Jiron v. City of Lakewood*, 392 F.3d 410, 415 n.2 (10th Cir. 2007) (quoting *Ryder v. City of Topeka*, 814 F.2d 1412, 1416 n.11 (10th Cir. 1987)).

separating the officers and the suspect; and (4) the manifest intentions of the suspect."

*Thomson*, 584 F.3d at 1314-15 (quoting *Estate of Larsen*, 511 F.3d at 1260).

In addition, we have held that "[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Jiron*, 392 F.3d at 415 (quoting *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995)). To be sure, we "consider an officer's conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force." *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) (quoting *Romero*, 60 F.3d at 705 n.5); *c.f., Tennessee v. Garner*, 471 U.S. 1, 8 (1985) ("[I]t is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out."). "Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983." *Sevier*, 60 F.3d at 699 & n.7.

We recognize that "officers are sometimes 'forced to make split-second judgments' in uncertain and dangerous circumstances," and "[w]hat may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time." *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) (quoting *Graham*, 490 U.S. at 395, 396-97). Ultimately, however, "the inquiry is always

-17-

whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Estate of Larsen*, 511 F.3d at 1260.

## IV

## Discussion

"Although we frequently conduct separate qualified immunity analyses for different defendants, we have not always done so at the summary judgment stage of excessive force cases." *Estate of Booker v. Gomez*, 745 F.3d 405, 421 (10th Cir. 2014). Indeed, when appropriate we will consider the officers' conduct in the aggregate. *See, e.g.*, *Lundstrom v. Romero*, 616 F.3d 1108, 1126-27 (10th Cir. 2010); *Fisher v. City of Las Cruces*, 584 F.3d 888, 895-902 (10th Cir. 2009); *York v. City of Las Cruces*, 523 F.3d 1205, 1210-11 (10th Cir. 2008); *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008). However, we have also analyzed the conduct of each officer individually in excessive force cases at the summary judgment stage. *See, e.g.*, *Casey*, 509 F.3d at 1282-87; *Walker v. City of Orem*, 451 F.3d 1139, 1159-61 (10th Cir. 2006); *Currier v. Doran*, 242 F.3d 905, 919-25 (10th Cir. 2001).

The facts and circumstances of the present case warrant analyzing the conduct of Officer White separately from the other officers, while considering the conduct of Officer Mariscal and Truesdale in the aggregate. Accordingly, we will follow the district court in analyzing the reasonableness of Officers Truesdale's

and Mariscal's actions together in one section, and then the conduct of Officer White in a separate section.

*A. Officers Mariscal and Truesdale*

Officers Mariscal and Truesdale argue on appeal that even viewing the facts found by the district court in the light most favorable to plaintiffs and accepting them as true, the officers' actions were objectively reasonable under the circumstances. Specifically, Officer Mariscal argues a reasonable officer in his position would have believed Officer White's life was in danger, and thus his use of force was objectively reasonable. Officer Truesdale contends that since he was at the rear of the house when Officer White shot Samuel Pauly, his use of force is not even at issue. Both Officers claim they cannot be held liable for Officer White's objectively reasonable use of force because neither officers' pre-seizure conduct was reckless nor the proximate cause of Samuel Pauly's death.

*1. Pre-seizure conduct and proximate cause*

"Section 1983 imposes liability on a government official who 'subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights." *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (quoting 42 U.S.C. § 1983). We have stated accordingly that "[a]nyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable." *Trask*, 446 F.3d at 1046. "'The requisite causal connection is satisfied if the defendant[s] set in motion a series of events that the defendant[s] knew or reasonably should have known would cause

-19-

others to deprive the plaintiff of his constitutional rights.'" *Id.* (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)). To be sure, "[s]ection [1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Martinez*, 697 F.3d at 1255.

In other words, Officers Mariscal and Truesdale may be held liable if their conduct immediately preceding the shooting was the but-for cause of Samuel Pauly's death, and if Samuel Pauly's act of pointing a gun at the officers was not an intervening act that superseded the officers' liability. "Foreseeable intervening forces are within the scope of the original risk, and . . . will not supercede the defendant's responsibility." *Trask*, 446 F.3d at 1047 (internal quotation marks omitted). Both officers claim they cannot be the proximate cause of Samuel Pauly's death, even assuming their pre-seizure conduct was negligent or reckless, because "neither officer could have foreseen that the two males inside the residence would suddenly threaten them and open fire," and "[u]nder the circumstances, the brothers' wholly disproportionate and unexpected response constituted superseding events that relieved" the officers from liability. Aplt. Br. at 55. We are not persuaded.

Here, taking the facts and reasonable inferences the district court determined, the brothers were in their home when Officers Truesdale and Mariscal approached it at night when it was raining and made threatening

-20-

comments about intruding into the home to get the brothers. The Supreme Court has long recognized–and continues to recognize–the individual's constitutional right to use arms to protect his home. *See District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008) (striking down a District of Columbia statute prohibiting the possession of handguns in the home). The Court stated:

> [T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. *The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.* Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family . . . would fail constitutional muster.

*Heller*, 544 U.S. at 628-29 (emphasis added) (footnote, citation, and quotation marks omitted).

In *State v. Boyett*, 185 P.3d 355, 358-59 (N.M. 2008), the Supreme Court of New Mexico reiterated that the "[d]efense of habitation has long been recognized in New Mexico," and that "[i]t gives a person the right to use lethal force against an intruder when such force is necessary to prevent the commission of a felony in his or her home." The court explained that "[t]he defense is grounded in the theory that '[t]he home is one of the most important institutions of the state, and has ever been regarded as a place where a person has a right to stand his [or her] ground and repel, force by force, to the extent necessary for its protection.'" *Id.*

-21-

at 359 (second and third alteration in original) (quoting *State v. Couch*, 193 P.2d 405, 409, (N.M. 1946)). Accordingly, "in every purported defense of habitation, the use of deadly force is justified only if the defendant reasonably believed that the commission of a felony in his or her home was immediately at hand and that it was necessary to kill the intruder to prevent the occurrence." *Id.* (citations omitted).

Significantly, the court in *Boyett* recognized it had "never held that entry into the defendant's home is a prerequisite for the defense. On the contrary, the seminal New Mexico case on defense of habitation was clear that, in certain circumstances, it may justify an occupant's use of lethal force against an intruder who is outside the home." *Id.* (citing *State v. Bailey*, 198 P. 529, 534 (N.M. 1921)). Relying on *Bailey*, the court explained that the "defense of habitation justifies killing an intruder who is assaulting the defendant's home with the intent of reaching its occupants and committing a felony against them" precisely because "[p]rotecting a defendant's right to prevent forced entry necessitates that the defense apply when an intruder is outside the home but endeavoring to enter it." *Id.*

The defense is relevant here because, as the district court determined, it is disputed whether the officers "adequately identified themselves" and whether the brothers could see the officers outside the lighted house "considering the ambient light and other light sources." Aplt. App. at 703. The district court correctly

-22-

pointed out that "[t]he outcome of these factual disputes is material to whether the brothers knew that State Police Officers were outside their house prior to Officer White shooting Samuel Pauly." *Id.* Because it was objectively reasonable under the circumstances about which the officers were aware that the brothers might believe the officers were intruders, a reasonable jury could find that it was foreseeable the brothers would arm themselves in defense of their home as permitted by New Mexico state law. *Boyett*, 185 P.3d at 358-59. Thus, Samuel Pauly's act of pointing a gun out the window in defense of his home would not be an intervening act superseding the liability of the officers.

Our opinion in *Trask v. Franco*, 446 F.3d 1036, is particularly instructive. There, state probation officers visited the residence of Carly Bliss and Dale Trask for a routine probation field inspection of Ms. Bliss. *Id.* at 1039. The officers believed Ms. Bliss was still on probation, but her probation had actually been discharged one month earlier. *Id.* Nobody answered the probation officers' knock on the door, but the officers could see movement in the house and believed, based on a previous statement Ms. Bliss had made to one of the officers about her abusive relationship with Mr. Trask, that she was afraid to open the door because of him. *Id.* at 1040. The probation officers therefore requested police assistance to provide support during the inspection. When a New Mexico State Police officer and a sheriff's deputy arrived, Mr. Trask eventually opened the front door. *Id.* He was wearing at least two knives in sheaths on his belt. *Id.* A lengthy

-23-

search of the residence ensued, and the state police officer arrested Mr. Trask. *Id.* Both Ms. Bliss and Mr. Trask brought a § 1983 action against the probation officers, among others, with Mr. Trask asserting claims for unlawful detention and arrest. *Id.* at 1040-41. The district court granted summary judgment to the probation officers on Mr. Trask's unlawful detention and arrest claims, finding no affirmative link between the alleged constitutional deprivations by the state police officer and the probation officers' duty to control him. *Id.* at 1041.

We explained that the probation officers could be held liable if they were the proximate cause of the harm but that "a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability." *Id.* at 1046. Thus, the question was "[w]hether Mr. Trask's appearance with knives was a superseding act that limited the probation officers' liability," and that depended "upon what the probation officers reasonably foresaw when they first called for backup." *Id.* at 1046-47. The court held "the record on appeal leaves too much unanswered, and it is premature without more evidence to discern what the probation officers reasonably foresaw when they called for backup." *Id.* at 1047. Significantly, we explained:

> [T]he reasonable foreseeability of [an intervening act's occurrence] is a factor in determining whether the intervening act relieves the actor from liability for his antecedent [wrongful act], and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was [wrongful] or foreseeable, the question should be left for the jury.

-24-

*Id.* (second, third, and fourth alteration in original).

Similarly, fact questions remain at a minimum as to whether the officers here could reasonably foresee that the brothers would defend their home with deadly force based on the prior circumstances that night and the officers' conduct in shouting "we got you surrounded. Come out or we're coming in."[5] Thus, because disputed facts remain concerning whether the officers properly identified themselves and whether the brothers knew Officers Mariscal and Truesdale were intruders or state police, summary judgment is not appropriate.

*2. Clearly established law*

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 207 (2001); *Casey*, 509 F.3d at 1283-84 (quoting *Saucier*).

"For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent." *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011); *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) ("A Government

---

[5] In *United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997), the Seventh Circuit explained that its "jurisprudence interpreting the Fourth Amendment has long recognized that police encounters at a person's dwelling in the middle of the night are especially intrusive," and that "when a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling must be examined with the greatest of caution."

official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.") (internal quotation marks omitted). The Supreme Court recently reaffirmed these principles, noting: "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *al-Kidd*, 563 U.S. at 741). Indeed, "the dispositive question is 'whether the violative nature of *particular* conduct is clearly established," *id.* (quoting *al-Kidd*, 563 U.S. at 742) (emphasis added), and "[t]he inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition,'" *id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

"The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Weigel*, 544 F.3d at 1153 (quoting *Cruz v. City of Laramie*, 239 F.3d 1183, 1187 (10th Cir. 2001)). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific

conduct in question, even though the very action in question has not previously been held unlawful." *Hope*, 536 U.S. at 741 (internal quotation marks omitted). Consequently, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* "The *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Casey*, 509 F.3d at 1284 (internal quotations and citations omitted).

This Circuit has adopted a sliding scale to determine when law is clearly established. *Id.* "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* "Thus, when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law." *Id.*

Since at least 2006, it has been clearly established in this circuit that the requisite causal connection for establishing a Section 1983 violation "is satisfied if the defendant[s] set in motion a series of events that the defendant[s] knew or reasonably should have known would cause others to deprive the plaintiff of [his constitutional rights." *Trask*, 446 F.3d at 1046 (alteration in original) (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir.1990)). Likewise, it has been clearly established since 2006 that for an officer to be liable under Section 1983,

-27-

the officer's conduct must be both a but-for and proximate cause of the plaintiff's constitutional harm. *Id.* Accepting as true plaintiffs' version of the facts, a reasonable person in the officers' position should have understood their conduct would cause Samuel and Daniel Pauly to defend their home and could result in the commission of deadly force against Samuel Pauly by Officer White.

*B. Officer White*

*1. Reasonableness of Officer White's Conduct*

As with Officers Mariscal and Truesdale, our analysis of Officer White's qualified immunity claim focuses on whether his actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Thomson*, 584 F.3d at 1313 (quoting *Graham*, 490 U.S. at 397). Officer White's use of deadly force "must be judged from the perspective of a reasonable officer 'on the scene,' who is 'often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Allen*, 119 F.3d at 840 (quoting *Graham*, 490 U.S. at 396-97).

An officer's pre-seizure conduct can be part of the reasonableness inquiry, but *only* if the officer's *own* "reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Jiron*, 392 F.3d at 415 (quoting *Sevier*, 60 F.3d at 699). Officer White did not participate in the events leading up to the armed confrontation, nor was he there to hear the other officers ordering

-28-

the brothers to "Come out or we're coming in." Aplt. App. at 678. Almost immediately upon Officer White's arrival, one of the brothers shouted "We have guns." The alleged reckless conduct of Officers Mariscal and Truesdale prior to this point cannot be attributed to Officer White, and accordingly, our analysis focuses only on the reasonableness of his own conduct.

"The Fourth Amendment permits an officer to use deadly force only if there is 'probable cause to believe that there [is] a *threat of serious physical harm to [the officer]* or to others.'" *Tenorio*, 802 F.3d at 1164 (quoting *Estate of Larsen*, 511 F.3d at 1260). In assessing "the degree of threat" the officer faces, "we consider a number of non-exclusive factors" that include: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larson*, 511 F.3d at 1260. But these four factors "are only aids in making the ultimate determination, which is 'whether from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" *Tenorio*, 802 F.3d at 1164 (quoting *Estate of Larson*, 511 F.3d at 1260). And ultimately, "[t]he primary focus of our inquiry . . . remains on whether the officer was in danger at the exact moment of the threat of force." *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (citing *Bella v. Chamberlain*, 24 F.3d 1251, 1256 &

n.7 (10th Cir. 1994); *Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995)).[6]

We recognize, as the dissent does, that this case presents a unique set of facts and circumstances, particularly in the case of Officer White who arrived late on the scene and heard only "We have guns," Aplt. App. at 680, before taking cover behind a stone wall fifty feet away from the Pauly's residence. Therefore, in accordance with the Supreme Court's instruction that we review the reasonableness of Officer White's actions by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," *Scott*, 550 U.S. at 383 (quoting *Place*, 462 U.S. at 703), we will analyze his conduct by weighing the three non-exclusive factors articulated in *Graham*, 490 U.S. at 396, as well as the four factors listed in *Estate of Larson*, 511 F.3d at 1260, in order to determine whether a constitutional violation occurred.

Because "[t]he test for reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," we must pay "careful attention to the facts and circumstances" of this particular case when assessing the reasonableness of Officer White's conduct. *Graham*, 490 U.S. at 396. Because

---

[6] We have also considered situations in which plaintiffs have alleged that an officer, *by failing to take cover*, created the exigency requiring use of force. *See Medina*, 252 F.3d at 1132; *Quezada v. Cty. of Bernalillo*, 944 F.2d 710, 717 (10th Cir. 1991). We concluded that officers are *not required* to take cover when they are faced with a deadly threat. Here, however, Officers White and Mariscal did take cover, before they were faced with any imminent harm.

-30-

"there is no easy-to-apply legal test for whether an officer's use of deadly force is excessive[] . . . , we must 'slosh our way through the fact-bound morass of reasonableness.'" *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (quoting *Scott*, 550 U.S. at 383).

The first factor from *Graham*, "the severity of the crime at issue," 490 U.S. at 396, weighs in favor of plaintiff estate. The district court found that once police arrived at the Glorieta off-ramp in response to a call concerning road rage, "the Officers did not believe any exigent circumstances existed," and that they "did not have enough evidence or probable cause to make an arrest." Aplt. App. at 677. It is thus unclear from the record what, if any, crime was committed during the road rage incident. At best, the incident might be viewed as a minor crime such as reckless driving or driving while intoxicated.[7]

At first glance, one could argue that the second factor from *Graham*, "whether the suspect poses an immediate threat to the safety of the officers or others," 490 U.S. at 396, weighs in favor of Officer White. But, as the district court determined, "Officer White took cover behind a stone wall located 50 feet from the front of the house and drew his duty weapon while Officer Mariscal took

---

[7] Under New Mexico law, reckless driving and driving while intoxicated (first offense) are misdemeanor offenses. *State v. Trevizo*, 257 P.3d 978, 982 (Ct. App. 2011) (citing N.M. Stat. Ann. § 66-8-113(B) (1978) (reckless driving); § 66-8-102(E) (DWI)) (holding that one-year statute of limitations for petty misdemeanors applied to the defendant's DWI and reckless driving charges).

cover behind a Ford pickup truck and unholstered his duty weapon." Aplt. App. at 680. Moreover, the undisputed facts in the record show that Officer White was behind cover fifty feet away *before* Samuel Pauly even opened the window. *Id.* at 680-81. Although the district court found that Samuel "held his arm out with a hand gun, pointing it at Officer White," *id.* at 681, it also concluded there was a fact issue as to whether Samuel actually fired the gun, *id.* nn. 8, 9. Finally, although Officer White claims he thought Officer Truesdale was shot by the two shotgun blasts he heard from behind the house, he admitted in his deposition that "I did not hear anything that would suggest [Officer Truesdale] had been hit." *Id.* at 223.

Significantly, "the law is clear that [Officer White's] belief must be reasonable." *Attocknie v. Smith*, 798 F.3d 1252, 1257 (10th Cir. 2015) (*petition for cert. filed* Dec. 22, 2015). While the dissent concedes that an Officer's subjective belief is irrelevant, it posits that "Officer White's uncontroverted subjective belief is objectively reasonable." Dissent at 5 n.1. But "the Fourth Amendment tolerates only reasonable mistakes, and those mistakes–whether of fact or of law–must be objectively reasonable. We do not examine the subjective understanding of the particular officer involved." *Heien v. North Carolina*, 135 S. Ct. 530, 539 (2014). In our view, there is at a minimum at least a fact question for the jury as to whether it was objectively reasonable for Officer White to immediately assume that one of his fellow officers was shot after hearing two

shots from the back of the house but nothing more to indicate that anyone had been hit. *Cf. Attocknie*, 798 F.3d at 1257 (affirming denial of qualified immunity to officer and rejecting claim officer saw suspect run into a house, noting "that a jury might reasonably refuse to credit his belief as reasonable" because a jury "could well find that [the officer] is not telling the truth about seeing someone running, or at least that he was not reasonable in inferring that the person he saw was [the suspect], especially given other evidence that [the suspect] was not seen by anyone else at the time and was not found there after the shooting").

Because Officers White and Mariscal were behind cover some distance away in the dark before Samuel even opened the window and there is a fact issue as to whether Samuel fired his weapon, for purpose of analysis on summary judgment Samuel Pauly did not "pose an *immediate* threat to the safety of the officers or others." *Graham*, 490 U.S. at 396 (emphasis added).

The third *Graham* factor, "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, also weighs in favor of plaintiff estate. As the district court determined, after the officers arrived on scene, spoke with the women about the incident, and then allowed the women to leave the Glorieta off-ramp, "any threat to the females was over." Aplt. App. at 676. More importantly, the court recognized that "the Officers did not believe any exigent circumstances existed," and that at that point, they "*did not have enough evidence or probable cause to make an arrest*." *Id.* (emphasis added).

-33-

Thus, when the officers, including White, went to the brothers' residence, they were not there to make an arrest as no grounds existed to do so. This is especially true for Samuel Pauly, who had been in his home playing video games before Daniel arrived that night. Accordingly, the brothers could not have been "attempting to evade arrest by flight," *Graham*, 490 U.S. at 396. This factor supports plaintiff estate.

Because Officer White fired the fatal shot, we turn to the four factors set out in *Estate of Larson*, 511 F.3d at 1260, to assess the "degree of threat" he faced. The first factor, "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands," *id.*, clearly supports plaintiff estate. For purposes of qualified immunity, the district court determined that Officer White did not identify himself or order Samuel Pauly to drop his weapon. The second factor, "whether any hostile motions were made with the weapon towards the officers," *id.*, weighs in favor of Officer White because the district court found that Samuel Pauly pointed a handgun at Officer White, or at least in his direction. The third factor, "the distance separating the officers and the suspect," *id.*, clearly supports plaintiff estate because Officer White was at least 50 feet away behind cover when he fired the fatal shot.

We consider the fourth factor, "the manifest intentions of the suspect," *id.*, to be somewhat neutral. The district court determined "a reasonable jury could find" that "it would have been reasonable for the Officers to conclude that Daniel

-34-

Pauly could believe that persons coming up to his house at 11:00 p.m. were connected to the road rage incident which had occurred a couple of hours previously," and "that under these circumstances, the occupants of the house would feel a need to defend themselves and their property with the possible use of firearms." Aplt. App. at 685. Under the circumstances here, such defense would be permissible under New Mexico state law. *See also Boyett*, 185 P.3d at 358-59. This conclusion comports with what the Supreme Court made clear in *Heller*, 554 U.S. at 628-29, that citizens have the inherent right to use weapons to defend their home against intruders.

Moreover, and importantly, the district court found a genuine fact issue remains as to whether Samuel Pauly even fired his weapon. Although Officers White and Mariscal claim that Samuel fired the handgun, the district court noted

> A revolver later found on the living room floor under the front window where Samuel Pauly was shot had one casing forward of the firing pin while the other four chambers were loaded. No bullet casing was recovered from the handgun, so there is no forensic proof that Samuel Pauly fired the handgun that night.

*Id.* at 681 n.8. Significantly, "Officer Mariscal strongly believes that he fired a shot at Samuel Pauly after Samuel Pauly fired the handgun," and the district court found that "Officer Mariscal was missing one cartridge from his magazine." *Id.* at 681 n.9 Thus, the court concluded: "since only four shots were fired that night, if Officer Mariscal fired the third shot as he claims and Officer White fired the fourth shot, then Samuel Pauly could not have fired upon Officer White." *Id.* At

-35-

most, from Officer White's perspective, the manifest intention of Samuel Pauly was unclear at the time Samuel pointed his weapon out of the window of his home.

Officer White stated in his deposition that when he was kneeling behind the rock wall, he saw Samuel Pauly shoot a "silver gun" directly towards his face. Aplt. App. at 223-24, White dep. at 137-44 ("I observed the male, with his right hand, extend his hand in a parallel position to the ground, pointing the gun toward my direction . . . [and] I observed the muzzle flash, and I heard the bang of the gun."). Nevertheless, "[b]ased on the physical evidence, a jury could reasonably decide to reject [Officer White's] testimony." *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) (holding fact issue precluded summary judgment on excessive force claim against officer). Indeed, "[c]onsidering the physical evidence together with the inconsistencies in the officer's testimony, a jury will have to make credibility judgments, and credibility determinations should not be made on summary judgment." *Id.* Moreover, "since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story–the person shot dead–is unable to testify.'" *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). As the Ninth Circuit noted in *Scott*, 39 F.3d at 915, "the court may not simply accept what may be a self-serving account by the police officer." Rather, "[i]t must also look at the circumstantial evidence that, if

-36-

believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* In any event, this factor highlights the district court's ultimate conclusion that genuine fact issues remain for the jury with respect to this issue.

Because our analysis "requires careful attention to the facts and circumstances of each case," *Graham*, 490 U.S. at 386, we note that factors one and three, as set out in *Estate of Larsen* and reiterated in *Tenorio*, are particularly relevant here: "(1) whether the officers ordered the suspect to drop his weapon," and "(3) the distance separating the officers and the suspect." *Estate of Larsen*, 511 F.3d at 1260; *Tenorio*, 802 F.3d at 1163. The undisputed facts establish that neither Officer White nor Officer Mariscal ordered the suspect to drop his weapon. In excessive force cases, "if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and *if where feasible*, some warning has been given." *Garner*, 471 U.S. at 11-12 (emphasis added); *Thomson*, 584 F.3d at 1321 (citing *Garner*). *See also Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003) (fact issue as to whether warning was feasible before deadly shot fired).

Plaintiffs' expert witness, Glenn A. Walp, testified that in his professional opinion it was feasible for Officer White to give the suspect a warning during the five-second interval between when Samuel aimed the gun and Officer White fired

his weapon, and that the officer's failure to do so was unreasonable.[8]  Aplt. App. at 289.  *See also id.* at 286, Walp dep. at 180 ("[B]etween the time when he saw the pointing of the weapon and what we will use for the sake of argument here today, five seconds, I feel that there was an extensive amount of time to at least yell something to the effect . . . of 'State Police, drop your weapon.'").  In this connection, we note that in *Tenorio*, within "*two or three seconds*" the officer "yelled, 'Sir, put the knife down!  Put the knife down, please!  Put the knife down!'" before he shot the decedent.  802 F.3d at 1163.

Moreover, as the circumstances in *Tenorio* show, the immediacy of the danger to the police officer is important:

---

[8] The dissent criticizes our use of Mr. Walp's testimony, noting that "we've previously discounted the use of expert testimony to undermine the reasonableness of an officer's on-scene judgment and we should do the same here,"  citing *Thomson*, 584 F.3d at 1320-21, and *Saucier*, 533 U.S. at 194 n.6.  Dissent at 9.  In essence, the dissent views our use of the expert testimony as the type of second guessing and 20/20 hindsight the Supreme Court has instructed is not appropriate when reviewing the reasonableness of an officer's conduct.  *See Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.").  However, we mention his testimony only because it supports the district court's determination that a reasonable jury could conclude it was feasible for Officer White to warn Samuel Pauly before shooting him, especially where he was behind cover before Samuel opened the window.  A jury may accept this testimony, but it may not.  But Mr. Walp's testimony highlights why a reasonable jury might conclude it was feasible.  In any event, we have not found a bright line rule precluding us from mentioning expert testimony in the record on a subject on which the district court found genuine fact disputes remain.  *See* Aplt. App. at 684-85 ("For example, it is disputed whether . . . it was feasible for Officer White to warn Samuel Pauly before shooting him.").

One could argue that [Officer] Pitzer appropriately used lethal force. The officers were responding to an emergency call for police assistance to protect against danger from a man who had been violent in the past and was waving a knife around in his home. The man was walking toward Pitzer in a moderate-sized room while still carrying the knife despite repeated orders to drop it.

*But the district court ruled that the record supports some potential jury findings that would establish Tenorio's claim–in particular, that Tenorio "did not 'refuse' to drop the knife because he was not given sufficient time to comply' with Pitzer's order*; that Tenorio made no hostile motions toward the officers but was merely "holding a small kitchen knife loosely by his thigh and . . . made no threatening gestures toward anyone."; *that Tenorio was shot "before he was within striking distance of [Pitzer] . . . ."*

*Id.* at 1164-65 (emphasis added).  Here, not only was Officer White fifty feet away from Samuel Pauly, Officer White was sequestered behind a rock wall and Samuel was aiming his gun through the open window of a lighted house toward a target obscured by the dark and rain.[9]

_____

[9] We disagree with the dissent's characterization of Officer White's position when he took cover as behind a "partial rock wall."  Dissent at 7 n.4, 8. By implying that Officer White was not in a protected position when Samuel Pauly pointed the gun in his direction, the dissent does not read the evidence in the light most favorable to plaintiff estate and fails to rely on the district court's determination of the evidence.  The dissent ignores the  "fundamental principle" that in reviewing the denial of a summary judgment motion based on qualified immunity, "reasonable inferences should be drawn in favor of the nonmoving party." *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) (reversing grant of summary judgment to Officer and holding the "court below credited evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion"); *accord Weigel*, 544 F.3d at 1147 ("In reciting the facts of this case, we view the evidence in the light most favorable to the non-moving party.").  The dissent clearly reads the evidence concerning the cover of his position in the light most favorable to Officer White

(continued...)

As Officer White described it when he was asked to explain what he did after he heard "We have guns," he said he ran and took cover behind a rock wall *before* Samuel opened the window and stuck his gun out.

> Q.  And, I'm sorry, I think you just said this, but the position that you took, you know, you ran down on the other side of the rock wall. Tell me again.  Were you standing?  Were you crouched?  What position were you in?
>
> A.  I was kneeling.
>
> Q.  So you're kneeling, one knee up and one knee down?
>
> A.  Both knees down.
>
> Q.  So both of your knees were on the ground, and where–were you looking towards the residence?
>
> A.  I was.

* * *

> Q.  So you kneeled down, both knees on the ground and looking over the top of the rock wall.  Is that right?
>
> A.  Correct.
>
> Q.  Did you have your duty weapon drawn?
>
> A.  I did.

* * *

> Q.  *Nobody was in the window at that point?  Is that correct?*

---

[9](...continued)
and impermissibly draws inferences in his favor.

A. *That's correct.*

Q. *Was the window up?*

A. *As in closed? It was closed.*

Q. Yes. So the window–both windows were closed at the point that you run down to the position in Exhibit 2?

A. Correct.

Q. *You have your weapon drawn. Where is it pointing at that time?*

A. *It's pointing in the direction of the house.*

Q. *Was it resting on the wall?*

A. *It was.*

Aplt. App. at 222 (emphasis added). Officer White's own description of his position at the time Samuel Pauly opened the window and pointed his gun out clearly supports the district court's description of him as "behind a stone wall located 50 feet from the front of the house." *Id.* at 680.

Officer White relies on our decision in *Wilson*, 52 F.3d at 1549, for the proposition that use of deadly force is reasonable where someone aims a gun at an officer. The facts there were entirely different. Officer Meeks was out in the open when he confronted Wilson, whom a witness described as "extremely drunk." *Id.* Officer Meeks suspected Wilson of holding a gun concealed behind his leg and ordered him to show his hand. Wilson did not comply, and the officer repeated his demand. When Wilson brought his gun forward and Officer Meeks

-41-

heard the sound of the handgun being cocked, he shot Wilson. *Id.* at 1553. It is clear from the facts in *Wilson* that Officer Meeks was in close range of the pointed gun and that an objectively reasonable police officer would have believed his life was in immediate danger. Similarly, in *Estate of Larsen*, 511 F.3d at 1258, "Larsen was within 7 to 12 feet" from the officers when he raised his knife, ignored the officer's warning to "Drop the knife or I'll shoot," and took a step toward the officer." *See also Thomson*, 584 F.3d at 1318 ("The time frame during which all of this happened was very short; from the time when Mr. Thomson came into view of the police until the time he was shot, possibly as few as ten seconds had elapsed. During that time, Mr. Thomson was repeatedly told to put down his weapon . . . .").

The dissent claims that "in endeavoring to affix liability on" Officer White, we stretch to distinguish *Wilson,* arguing that the threat to Officer White was "even more immediately compelling than those faced by the shooting officer in *Wilson*." Dissent at 7. This is so, the dissent contends, because Officer White was not "fully protected" when he took cover behind a stone wall but rather "was kneeling in a vulnerable position behind a short rock wall—a wall that at most provided partial cover from the armed suspect pointing a gun at him and potentially no cover from the second armed suspect whose exact location outside was unknown." Dissent at 7 n.5. But as we have already noted, the dissent's claim completely ignores the long standing rule that we must view the evidence in

-42-

the light most favorable to plaintiff estate, and that "reasonable inferences should be drawn in favor of the nonmoving party." *Tolan*, 134 S. Ct. at 1868. Instead, the dissent assumes facts in the light most favorable to Officer White. The dissent's reliance on *Wilson* is accordingly flawed.

Based on the record in the present case, viewed in plaintiff estate's favor, we agree with the district court that a jury could find a reasonable officer in Officer White's position would *not* have probable cause to believe there was an *immediate* threat of serious harm to himself or to Officer Mariscal, who was also behind cover, such that he could shoot Samuel Pauly through the window of his home without giving him a warning. As a result, the jury could conclude Officer White's use of deadly force against Samuel Pauly was not objectively reasonable and violated the Fourth Amendment.

*2. Clearly Established*

Having held that the evidence is sufficient to establish an excessive force claim, we turn to whether the law was clearly established at the time of the violation. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 207; *Casey*, 509 F.3d at 1283-84.

*Graham*, 490 U.S. at 396, and its Tenth Circuit progeny, including our 1997 decision in *Allen*, clearly established that the reasonableness of an officer's use of

force depends, in part, on "whether the officer[] [was] in danger at the precise moment that [he] used force." *Allen*, 119 F.3d at 840 (quoting *Sevier*, 60 F.3d at 699). In addition, since 1985 and the Supreme Court's decision in *Garner*, it has been clearly established that "if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and *if where feasible*, some warning has been given. 471 U.S. at 11-12 (emphasis added); *see also Vaughan*, 343 F.3d at 1331 (fact issue as to whether warning was feasible before deadly shot fired).

The dissent argues that by relying on *Graham* and *Allen*, we violate the Supreme Court's instruction not to define clearly established law too generally. Dissent at 11. It is true that in *Mullenix*, the Court stated that it has "repeatedly told courts . . . not to define clearly established law at a high level of generality." 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). But the central question, the Court noted, is "whether the violative nature of *particular* conduct is clearly established." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). In reversing the Fifth Circuit's clearly established law analysis "that a police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others," the Court explained that it had "previously considered – and rejected – almost that exact formulation of the qualified immunity question . . . [i]n *Brosseau* [*v. Haugen*, 543 U.S. 194, 199 (2004)]." *Id.* at 308-09 (internal citation and quotation marks omitted). *Mullenix* is thus distinguishable from this

-44-

case because there were clearly other cases on point there that had rejected the argument used to form the basis of the Fifth Circuit's decision.

Notably, in *Brosseau*, 543 U.S. at 199, a case decided in 2004, the Court reversed the Ninth Circuit's denial of qualified immunity, holding that using the "general" test for excessive force cases from *Garner*, 71 U.S. at 85, was "mistaken." The Court explained that the Ninth Circuit erred in finding "fair warning in the general tests set out in *Graham* and *Garner*," because "*Graham* and *Garner*, following the lead of the Fourth Amendment's text, are cast at a high level of generality." *Id.* at 199. Rather, the Court explained that the relevant inquiry was whether it was clearly established the officer's conduct was prohibited by the Fourth Amendment in the specific "situation [Brosseau] confronted." *Id.* at 199-200. Most significantly, the Court cited *Hope*, 536 U.S. at 738, for the proposition that "of course, in an obvious case, [the *Garner* and *Graham*] standards can 'clearly establish' the answer, even without a body of relevant case law." *Id.* at 199. Nothing in *Mullinex* overruled *Hope* on this point.

Building on the Court's decision in *Hope*, our decision in *Casey* decided almost three years after *Brosseau*, explained that "[t]he *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." 509 F.3d at 1284, (internal quotation marks omitted). We explained that "[w]e therefore adopted a

-45-

sliding scale to determine when law is clearly established, *id.*, stating that "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).

Taking the facts as the district court determined them in the light most favorable to plaintiff estate, we are presented with this situation: an officer outside someone's home in the dark of night with no probable cause to arrest anyone and behind the cover of a wall 50 feet away from a possible threat, with no warning shot a man pointing his gun out of his well-lighted window at an unknown person in his yard while the man's brother fired protective shots in the air from behind the house. Given his cover, the distance from the window, and the darkness, a reasonable jury could find that Officer White was not in immediate fear for his safety or the safety of others. Any objectively reasonable officer in this position would well know that a homeowner has the right to protect his home against intruders and that the officer has no right to immediately use deadly force in these circumstances. Based on our sliding scale test established in *Casey*, 509 F.3d at 1284, we do not agree with the dissent that more specificity is required to put an objectively reasonable officer on fair notice.

Accordingly, accepting as true plaintiff estate's version of the facts, a reasonable officer in Officer White's position should have understood, based on

clearly established law, that (1) he was not entitled to use deadly force unless he was in danger at the exact moment of the threat of force and (2) he was required, under the circumstances here, to warn Mr. Pauly to drop his weapon.

# V

## Conclusion

We AFFIRM the district court's denial of summary judgment.

*Pauly v. White*, No. 14-2035

**MORITZ**, Circuit Judge, dissenting:

Undeniably, Samuel Pauly's tragic shooting should never have occurred. So at first glance, it's hard to find fault with the majority's lengthy and compelling discussion of Officers Mariscal's and Truesdale's questionable actions leading up to the tragedy. But the majority's preliminary focus on those two officers, though effectively placed, is legally misplaced. That's because neither Officer Mariscal nor Officer Truesdale shot Samuel Pauly. Instead, Officer White fired the bullet that killed Samuel Pauly. In some cases, this might be the proverbial distinction without a difference. But that is decidedly not the case here because, as the majority recognizes, Officer White came late to the scene and can't be held responsible for the acts of Officers Truesdale and Mariscal.

The majority nevertheless finds that even considering Officer White's actions separately, a reasonable jury could conclude he used excessive force in shooting Samuel Pauly. But, in reaching that conclusion, the majority impermissibly second-guesses Officer White's split-second decision to use deadly force in self-defense. I would find that under the unique circumstances of this case, Officer White clearly did not use excessive force in shooting Samuel Pauly; thus, no constitutional violation occurred. And if no constitutional violation occurred, the law won't permit us to pin liability on those officers who perhaps should bear responsibility: Truesdale and Mariscal. Instead, all three officers are entitled to immunity.

I also disagree with the majority's conclusion that the plaintiffs' facts, accepted as true, establish that Officer White's use of deadly force violated clearly established law.

To arrive at this determination, the majority mistakenly defines clearly established law at a high level of generality, engaging in exactly the type of review our Supreme Court has consistently cautioned against. As the Court recently reiterated, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011)).

Because I would conclude Officer White's use of deadly force was objectively reasonable and didn't violate clearly established law governing the use of deadly force, I would reverse and remand with directions to grant summary judgment in favor of all three defendants.

## DISCUSSION

The doctrine of qualified immunity insulates law enforcement officers from civil liability for the use of excessive force—even deadly force—unless their actions violate clearly established statutory or constitutional rights. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). "For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent." *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011). This does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 131 S. Ct. at 2083). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Barkes*, 135 S. Ct. at 2044 (alteration in original) (quoting *al-Kidd*, 131 S. Ct. at 2085).

2

When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff to demonstrate (1) the defendant violated a constitutional right and (2) the contours of that right were "clearly established" at the time of the violation. *Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010). If the plaintiff doesn't satisfy "'[t]his heavy two-part burden . . . the defendants are entitled to qualified immunity.'" *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877-78 (10th Cir. 2014) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)), *cert. denied sub nom. Malcom v. Felders*, 135 S. Ct. 975 (2015).

## I.      Officer White is entitled to qualified immunity because his actions were objectively reasonable under the circumstances.

Because the plaintiffs allege Officer White violated Samuel Pauly's Fourth Amendment right to be free from excessive force, they must demonstrate that White's use of deadly force was objectively unreasonable. *See Havens v. Johnson*, 783 F.3d 776, 781 (10th Cir. 2015). As the majority acknowledges, an officer's use of deadly force is objectively reasonable if a reasonable officer confronted with the same circumstances would have had probable cause to believe that he or she faced an immediate threat of serious physical harm. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Thomas*, 607 F.3d at 664, 670.

We generally consider several non-exclusive factors in assessing the degree of threat a suspect poses to the officer, including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the

3

suspect." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1314-15 (10th Cir. 2009) (quoting *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)).

These factors, while significant, only assist us in making the ultimate determination, which is "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (quoting *Estate of Larsen*, 511 F.3d at 1260). Moreover, in the qualified immunity context, an officer's on-scene judgment regarding the level of force that is necessary "need not be correct—in retrospect the force may seem unnecessary—as long as it is reasonable." *Id.*

Viewing the plaintiffs' factual allegations as true and considering the totality of the circumstances known to Officer White from the perspective of an objectively reasonable officer in White's position, I would conclude the plaintiffs haven't demonstrated a Fourth Amendment violation.

When Officer White arrived at the Paulys' house, he saw Officer Mariscal in the front yard and he heard Officer Truesdale's voice near the back of the house. He saw people moving inside the house. Within seconds of his arrival, Officer White heard one of the Pauly brothers yell, "We have guns." Aplt. App. 680. Officer White took cover behind a stone wall about 50 feet from the front of the house. Officer Mariscal took cover behind a nearby truck. Both officers drew their weapons. A few seconds later, Officer White heard two gunshots fired near Officer Truesdale's location at the rear of the house. Officer White believed that Truesdale had been shot.[1] Within seconds of hearing those

_____

[1] The majority implies that Officer White's belief on this point was less than

4

two shots, Officer White saw Samuel Pauly lower the front window, hold his arm out, and point a handgun directly at White. Four or five seconds later, Officer White fired his weapon, shooting and killing Samuel Pauly.

Even under plaintiffs' version of the facts, these material facts are uncontroverted. And given these facts, Officer White's use of deadly force was unquestionably justified. But the majority concludes that "a jury could find a reasonable officer in Officer White's position would *not* have probable cause to believe there was an *immediate* threat of serious harm to himself or to Officer Mariscal, who was also behind cover, such that he could shoot Samuel Pauly through the window of his home without giving him a warning." Maj. Op. 43.

In reaching this conclusion, the majority purports to separately consider the three *Graham*[2] factors and the four non-exclusive *Thomson* factors, but ultimately cherry-picks two *Thomson* factors it finds "particularly relevant" to Officer White's on-scene threat assessment: the distance separating Samuel Pauly and White, and White's failure to warn Samuel before shooting him. Maj. Op. 37. However, the majority's analysis of these two

---

credible because he also testified in his deposition that he "did not hear anything that would suggest a person had been hit." Maj. Op. 7-8, n.3 & 32. In doing so, the majority overlooks two points. First, the district court's order demonstrates that Officer White's belief on this point was uncontroverted. *See* Aplt. App. 680 ("Having heard two rifle shots, Officer White believed that Officer Truesdale had been shot."). Second, even if the majority doubts the reasonableness of Officer White's subjective belief as to whether Officer Truesdale had been shot, the question before us is whether a reasonable officer having heard two gunshots near the location of his or her fellow officer—an officer who is out of sight in the dark—would have had an objective basis for sharing White's belief. In my view, Officer White's uncontroverted subjective belief is objectively reasonable.

[2] *Graham v. Connor*, 490 U.S. 386 (1989).

5

factors is flawed.[3]

Focusing on the distance between Samuel Pauly and Officer White, the majority speculates that a reasonable officer in White's position wouldn't have perceived an immediate threat of physical harm because (1) White was 50 feet away from Samuel; (2) White was "sequestered" behind the rock wall; and (3) Samuel's view of White may have been obscured by the darkness and the rain. Maj. Op. 39-42.

I don't disagree that an officer's distance from the suspect and the existence of cover are important considerations in assessing whether the officer's use of deadly force was objectively reasonable.[4] But the majority brushes aside this court's precedent in determining that these factors undermine the reasonableness of Officer White's actions in this case.

Our precedent with the most analogous facts—*Wilson v. Meeks*, 52 F.3d 1547

---

[3] The majority's seven-factor approach seemingly overlooks that the four *Thomson* factors merely flesh out the second *Graham* factor—i.e., whether the officer faced an immediate threat from the suspect.

[4] The majority also suggests a reasonable officer would have taken comfort in the knowledge that Samuel Pauly "aim[ed] his gun through the open window of a lighted house toward a target obscured by the dark and rain." Maj. Op. 39. This suggestion warrants little discussion. Even though a reasonable officer would know Samuel Pauly was looking into the darkness, we can't expect a reasonable officer to know whether that darkness impaired Samuel's ability to find a target. *Wilson v. Meeks*, 52 F.3d 1547, 1553-54 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001) ("Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant. It requires that he react reasonably to a threat."). The majority's determination that the fourth *Thomson* factor is "neutral" similarly suggests that a reasonable jury could find a reasonable officer in Officer White's position would have known what the Paulys were thinking—namely, that the Paulys believed they were protecting their home from unknown intruders. Maj. Op. 34-35. Yet the fourth factor requires consideration only of the "manifest" intentions of the suspect. In this case, Samuel Pauly manifested his intentions quite clearly and this factor, far from being neutral, weighs in favor of Officer White's decision to shoot.

(10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001)—

is also the most compelling. There, as here, the family of a man shot and killed by a

police officer sought civil damages under § 1983. We found the officer entitled to

qualified immunity, reasoning that the confrontation leading to the fatal shooting

"transpired in less than a minute," the plaintiffs failed to produce evidence to rebut the

officer's assertion that the decedent aimed a handgun at the officer, and "[a]ny police

officer in [the officer's] position would reasonably assume his life to be in danger when

confronted with a man whose finger was on the trigger of a .357 magnum revolver

pointed in his general direction." *Id.* at 1549, 1554.

Despite these similar circumstances, the majority stretches to distinguish *Wilson*,

pointing out that the shooting officer in that case was exposed rather than "sequestered"

behind a rock wall. Maj. Op. 39, 41-42.[5] Yet in endeavoring to affix liability on the

shooting officer here, the majority ignores circumstances that unquestionably rendered

the threat to Officer White even more immediately compelling than those faced by the

shooting officer in *Wilson*.

Here, Officer White was confronted with one man pointing a gun in his direction

and another man who he reasonably believed was somewhere outside and had just shot

---

[5] The majority's characterization of Officer White's position as "sequestered" behind the stone wall inaccurately implies that he viewed the scene from a fully protected vantage point. It's true that Officer White testified in deposition that he took cover behind a stone wall 50 feet from the house. But Officer White further explained that he knelt behind the wall and rested his arms on top of it as he pointed his gun in the general direction of the house and that his head and arms remained fully exposed. White Depo., Doc. 84-3, at 4. Thus, far from being "sequestered," Officer White was kneeling in a vulnerable position behind a short rock wall—a wall that at most provided partial cover from the armed suspect pointing a gun at him and potentially no cover from the second armed suspect whose exact location outside was unknown.

7

White's fellow officer. Notwithstanding these exceedingly fluid and highly threatening circumstances, the majority suggests that a reasonable officer in Officer White's position should essentially have called a time out while he contemplated the most prudent course of action. And during that time out, the majority presumes Officer White—or a reasonable officer in his shoes—would have discounted the threats posed by an armed suspect pointing a handgun in his direction and a second armed suspect in close proximity as non-immediate threats because the officer was himself behind a partial rock wall and the suspect who was pointing a gun at him was 50 feet away.[6]

In my view, no objectively reasonable officer in Officer White's circumstances and with White's knowledge of these circumstances could have been expected to hold his fire. And to suggest he should have done so because of his less than fully protected position some 50 feet away seems the epitome of "second-guessing." Yet the majority's speculation doesn't stop there. Piggybacking off of its judgment that Officer White faced no immediate threat given his "protected" position, the majority further decrees that a reasonable officer in White's position would have shouted a warning before using deadly force.

As the majority acknowledges, a warning need only be given "*where feasible*." *Garner*, 471 U.S. at 11-12 (emphasis added); *see also Thomson*, 584 F.3d at 1321 (rejecting plaintiff's argument that unleashing police dog without a warning created the

---

[6] Moreover, the majority's suggestion that the 50-foot distance between Samuel Pauly and Officer White somehow weighs in favor of the plaintiffs here is mystifying. Not surprisingly, the majority offers no authority suggesting that the "distance" factor has any relevance in circumstances where an officer is confronted with a suspect pointing a gun directly at him. Nor am I aware of any such authority.

need to use deadly force and concluding "[a] warning is not invariably required even before the use of deadly force . . ."). In concluding such a warning was feasible here, the majority primarily relies on the professional opinion of the plaintiffs' expert witness, Glenn A. Walp, who testified in a deposition, "I feel that there was an extensive amount of time to at least yell something to the effect . . . of 'State Police, drop your weapon.'" Maj. Op. 37-38.[7]

With all due respect to Mr. Walp, we've previously discounted the use of expert testimony to undermine the reasonableness of an officer's on-scene judgment and we should do the same here. *See Thomson*, 584 F.3d at 1320-21 (rejecting plaintiffs' reliance on expert testimony that release of attack dog was "inadvisable," reiterating the need to avoid 20/20 hindsight, and concluding, "We cannot now consider whether other actions would have been more appropriate or, indeed, optimal"). *See also Saucier v. Katz*, 533 U.S. 194, 216, n.6 (2001) (Ginsburg, J., concurring in judgment) ("[I]n close cases, a jury does not automatically get to second-guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently." (quoting *Roy v. Inhabitants of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994))).[8]

---

[7] The district court determined, based on Officer White's testimony, that White shot Samuel Pauly "[f]our to five seconds after Samuel Pauly pointed his handgun at Officer White." Aplt. App. 681. As the majority acknowledges, Mr. Walp assumed "for the sake of argument" during his deposition that the five-second interval was accurate. Maj. Op. 38.

[8] Comparing the circumstances of *Tenorio*, the majority appears to suggest that Officer White had plenty of time to shout a warning before shooting Samuel Pauly. Maj. Op. 38-39. But *Tenorio*'s markedly different circumstances simply don't permit this comparison. *See Tenorio*, 802 F.3d at 1164-65 (officer shot man who held a small kitchen

I would find Mr. Walp's speculation about what other actions Officer White could've or should've taken before shooting Samuel Pauly immaterial to the question of whether what he *actually* did was objectively reasonable. *See Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993) ("The Constitution, however, requires only that the seizure be objectively reasonable, not that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight vision."). And I would view *Garner*'s general proposition that a warning be given where feasible as yet another reminder of our paramount duty to judge "[t]he 'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The majority's contrary view ignores our Supreme Court's directive to consider, in the "calculus of reasonableness," the fact that police officers often are required to make split-second judgments—in "tense, uncertain, and rapidly evolving" circumstances—"about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Simply stated, I am unwilling to view Officer White's actions through the improper lens of hindsight from the comfort of my chambers. *See Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) ("What may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time." (citing *Graham*, 490 U.S. at 396)). Instead, I would conclude the plaintiffs have not met their heavy burden to demonstrate a

knife but made no hostile motions toward the officer). Here, the majority explicitly recognizes that Samuel Pauly made a hostile motion toward Officer White by pointing a gun at him. Maj. Op. 34.

10

constitutional violation. And while I share the majority's concern about the actions of the non-shooting officers prior to Officer White's arrival, those actions shouldn't factor into our analysis of whether White's use of force was reasonable under the unique circumstances of this case.

II.     **Even if Officer White's actions were objectively unreasonable, White is entitled to qualified immunity because the law was not clearly established that he could not use deadly force in the circumstances confronting him.**

Even accepting the majority's conclusion that Officer White's use of deadly force was objectively unreasonable, I disagree with the majority's ultimate conclusion that "a reasonable officer in Officer White's position should have understood, based on clearly established law, that (1) he was not entitled to use deadly force unless he was in danger at the exact moment of the threat of force and (2) he was required, under the circumstances, to warn [Samuel] Pauly to drop his weapon." Maj. Op. 46-47.

To support its first point, the majority relies on *Graham* and *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), for the general proposition that an officer may not use deadly force unless he or she faces the immediate threat of physical harm. But the majority's reliance on these cases to define the clearly established law governing this case directly contravenes the Supreme Court's warnings against "defin[ing] clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 131 S. Ct. at 2084). The Court has repeatedly cautioned "that *Garner* and *Graham*, which are 'cast at a high level of generality,'" offer little guidance in determining the reasonableness of an officer's actions in a particular case. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

11

The Court recently and strongly reaffirmed this principle in *Mullenix*. There, the Court reversed a Fifth Circuit decision denying qualified immunity based on that Circuit's conclusion that "the law was clearly established such that a reasonable officer would have known that the use of deadly force, absent a sufficiently substantial and immediate threat, violated the Fourth Amendment." *Mullenix*, 136 S. Ct. at 308 (quoting *Luna v. Mullenix*, 773 F.3d 712, 725 (5th Cir. 2014), *rev'd* 136 S. Ct. 305 (2015)). The Court explained that "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 131 S. Ct. at 2084). And, in concluding that the shooting officer in *Mullenix* was entitled to qualified immunity, the Court explicitly noted that "none of [its] precedents 'squarely govern[ed]' the facts" confronted by that officer. *Id.* at 310.

Yet, in its attempt to lessen the impact of *Mullenix*, the majority seemingly adopts the rationale of the dissenting justice in *Mullenix* by suggesting that any reasonable officer in Officer White's position would have had "fair notice" from *Graham* that he couldn't use deadly force in the circumstances he confronted and that no case more specific than *Graham* is required. Maj. Op. 45-46. *See Mullenix*, 136 S. Ct. at 314 (Sotomayor, J., dissenting) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) for the proposition that "the crux of the qualified immunity test is whether officers have 'fair notice' that they are acting unconstitutionally").

Notably, the *Mullenix* majority pointed out that the dissenting justice only repeated the Fifth Circuit's error in defining the qualified immunity inquiry at a high level of generality. *Mullenix*, 136 S. Ct. at 311. In doing so, the Court stated, "[W]hatever can be

12

said of the wisdom of [the officer's] choice [to use deadly force], this Court's precedents do not place the conclusion that he acted unreasonably in these circumstances 'beyond debate.'" *Id.* (quoting *al–Kidd*, 131 S. Ct. at 2074).

Likewise, the extant case law here doesn't place the conclusion that Officer White acted unreasonably under the circumstances beyond debate. Significantly, the only "particular conduct" the majority suggests violated clearly established law is Officer White's failure to issue a warning before using deadly force.

But, like the cracked foundation underlying the majority's first point, the foundational support for its second point also shows signs of strain. As stated, "[a] warning is not invariably required even before the use of deadly force"; rather, an officer must issue a warning "where feasible." *Garner*, 471 U.S. at 11-12; *Thomson*, 584 F.3d at 1304. Such language hardly mandates a finding that a failure to warn in particular circumstances is clearly established. Nevertheless, the majority expects a reasonable officer to understand extant case law as clearly establishing that a warning is not only feasible, *but required*, when the officer (1) is faced with two armed suspects, one pointing a gun at the officer from inside a house; (2) is partially protected by a stone wall; (3) is separated from the most immediate threat by 50 feet; and (4) in hindsight, has at least 5 seconds to shout a warning before firing his own weapon.

Simply stated, neither *Garner* nor any of the cases properly interpreting it would have caused a reasonable officer in Officer White's position to understand that "he was required, under the circumstances here, to warn [Samuel] Pauly to drop his weapon." Maj. Op. 47. Because none of the cases cited by the majority are "close enough [to] on

13

point to make the unlawfulness of [Officer White's] actions apparent," *Mascorro*, 656 F.3d at 1208, I would conclude Officer White is entitled to qualified immunity.

**III.    Officers Truesdale and Mariscal are entitled to qualified immunity because Officer White did not use excessive force.**

Because I would conclude that Officer White didn't violate Samuel Pauly's Fourth Amendment right to be free from the use of excessive force, and, alternatively, didn't violate clearly established law governing the use of deadly force, I would also conclude that Officers Truesdale and Mariscal are entitled to qualified immunity. *See, e.g.*, *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 420-21 (4th Cir. 1996) (explaining jury's finding that shooting officer didn't use excessive force absolved non-shooting officers of liability); *McLenagan*, 27 F.3d at 1008 (explaining that even if non-shooting officer's action or failure to act contributed to use of force, issue of liability was mooted by finding that shooting officer didn't use constitutionally excessive force).

CONCLUSION

Officer White did what any objectively reasonable officer in his position would do—respond in kind to the immediate threat of deadly force. Because the plaintiffs fail to establish either that Officer White's use of deadly force was objectively unreasonable or that it violated clearly established law, I would reverse the district court's rulings and grant all three defendants' motions for summary judgment on qualified immunity grounds with respect to the plaintiffs' § 1983 claim.

14